HEMMING MFG. CO. v. CUTLER-HAMMER MFG. CO.

(Circuit Court of Appeals, Seventh Circuit. April 10, 1917.)

No. 2368.

1. PATENTS ⬨328—VALIDITY AND INFRINGEMENT—INSULATING MATERIAL.
    The Muller patent, No. 869,321, for an insulating material and process of making the same, describes a process which, if followed, produces a substance which is worthless as an insulating material; also *held* not infringed, if conceded validity.

2. PATENTS ⬨99—VALIDITY—CLAIMS FOR NEW PRODUCT.
    Although claims for a new product, having definite characteristics by which it may be identified and which distinguish it from the process by which it is made, are not limited to the product as made by the disclosed process, nevertheless product claims are not sustainable, unless the specification discloses at least one practicable way in which to make the product.

———————

⬨For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

Suit in equity by the Hemming Manufacturing Company against the Cutler-Hammer Manufacturing Company. Decree for defendant, and complainant appeals. Affirmed.

This is an appeal from a decree dismissing for want of equity appellant's bill for alleged infringement of the Muller patent .869,321, October 29, 1907, for insulating material and method of manufacturing the same.

The claims in suit and the material parts of the specification are as follows:

"By my invention, I provide a fire-proof electrical insulating material which has a high specific resistance sufficiently near to that of rubber or porcelain to make it satisfactory in the electrical art. It will withstand as high a degree of heat as it will be subjected to in practice without loss of its insulating properties, whereby it may be used in place of porcelain and it may be worked with tools practically as easily as wood. It takes a screw-thread very satisfactorily. Moreover, it may be also molded into shape in the same manner as rubber or porcelain and does not require the use of heat in its manufacture. It does not shrink as porcelain does in molds and costs very much less than hard rubber or porcelain to produce.

"The invention will now be described in its preferred embodiment when such embodiment is a solid.

"In carrying out my invention, for making solid, fire-proof, electrical insulating material, I combine a fire-resistant material, for example, asbestos, preferably in a comminuted state, by means of a binder consisting of a bituminous material whose fusing point is substantially as high as that of mineral pitch—that is, relatively high for a binding material of this kind, dissolved in a suitable volatile solvent (such as benzol or other volatile hydrocarbon, for example) of such bituminous material, the proportions of the binder and fire-resisting material being such that a consistent plastic mass is formed which is then subjected to heavy pressure, preferably in a cold state, and dried by the evaporation of the solvent whereby a solid fire-proof and hard insulating material is obtained, having all the desirable properties required in the art.

"In order to distribute the pitch uniformly between the asbestos fibers or particles and to entangle the latter at the same time, the asbestos is intimately mingled with the volatile pitch solution and then heavily compressed preferably in a cool state and dried by evaporation as stated. In the solid material thus produced, the firm consistency of pitch after compression and evaporation of the volatile solvent makes the asbestos fibers non-hygroscopic and the solid product is in fact so non-inflammable that it may be subjected temporarily to an electric arc without being burned up and without being softened.

"In view of the fact that the bituminous material, such for example, as mineral pitch will burn at a relatively low temperature whereas when combined, as in my invention, the product is practically fire-proof, it is probable that this paradoxical action is due to the fact that in the completed material produced by my invention, asbestos is the chief fire resistant material, while the pitch seems merely to impregnate and coat the particles of asbestos and to cement them together, the amount of pitch being so minimized that the pitch in the completed material constitutes a substantially non-inflammable factor. It is possible that the ability of the pitch to resist high temperatures to which the material may be subjected without softening or igniting, is due to the fact that the relatively thin layers of the binding material are protected by the asbestos from access of oxygen. When the particles or fibers of the fire-resisting material are cemented together by the binder, and the mass is subjected to heavy pressure for condensing or initially hardening it, the pitch remaining in the compressed mass is minimized in quantity and is present in what may be designated as approximately filmiform layers or coatings and although made from a material which in ordinary relations is easily inflammable are, nevertheless, practically non-inflammable and practically non-softing, as is proven by subjection of samples to the electric arc. Herein

lles a reconcilement of antagonisms, the theory of which I do not pretend to precisely understand, but which I have hereinbefore set forth according to the best of my present understanding. By the gradual evaporation of the solvent (I recommend a volatile hydrocarbon, especially benzol, for use as a solvent), my new solid product is given a peculiar character, which, although the product is refractory and hard, permits the product to be worked readily with tools and in molds without anything more than ordinary wear and tear.

"In my process of making insulating material, I preferably prepare a binder consisting of 100 parts of the bituminous material, such as mineral pitch, dissolved at about normal temperature in approximately 20 parts by weight of a volatile solvent, such as benzol, or the like. This solution is mixed, preferably without the application of heat, with a preferably comminuted natural asbestos in the proportion of 20 to 75 parts of the solution to 100 parts of the fire-resisting material to form a consistent plastic mass, which may be molded or otherwise compressed into the desired shape. The consistency of the mass will depend upon the proportions of the ingredients within the limits mentioned and may be varied according to the properties desired in the product.

"Instead of using asbestos only, I may mix with it a suitable heat, water and fire-proof filler, such, for example, as quartz or kaolin; for example, 100 parts of the asbestos may be mixed with from one to 100 parts by weight of the filler which is preferably a finely pulverized, inorganic body. This mixture of the asbestos with the finely pulverized, inorganic heat, water and fire-proof filler is then combined with the binder in the same manner and in substantially the same proportions as hereinbefore described.

"The volatile ingredient of the compressed product is permitted to evaporate therefrom by exposure to air whereupon the product is hardened by the evaporation of the solvent. If desired, the compressed mass may be subjected to heat for the purpose of hastening the evaporation.

"The resultant product has a high degree of hardness, may be worked with facility by means of tools, takes a high polish, possesses extraordinary power of resistance to many acids and alkalies, is not hygroscopic and its resistance to heat and to the electrical current is very high. For example, it has been shown that a sample of my new product having an average thickness of 10.95 millimeters had an insulation resistance of more than 5,000,000 megohms, and that when the sample of my new product was placed in an arc, a black smoke was emitted; the samples being red hot and burned with a yellow flame, which continued for a second or two after the sample had been removed. After exposure to the arc, the sample had a steel blue appearance. It was consumed very slowly, three minutes' exposure slightly rounding the edges. It did not soften. By reason of these various properties, my new product is admirably adapted for employment as an electrical insulating material. Moreover, owing to the low cost of the materials employed in its manufacture and the relatively simple process required to produce it, the insulating devices in any desired form may be made at such a low price as to render the material capable of general use in the arts.

"My new material may be used for other purposes than electrical insulation, but that use is its peculiar and most striking field. If it is desired, the unpressed plastic mass above described may be used as a fire-proof non-conductor in many situations where it may be allowed to harden in situ.

"When the composition is compressed the voids or spaces occurring between the asbestos fibers or particles are substantially filled up, although it is probable that the evaporation of the solvent effects a certain degree of porosity in the compacted mass, the possible porosity enhancing the insulating capacity of the mass, while its exterior skin is more hardly condensed."

The claims in suit are:

"2. An insulating material consisting of a hardened mass comprising fragments of fire-resistant material cemented together by a bituminous material having a relatively high fusing point, the bituminous material being only sufficient in quantity to fill substantially the voids whereby the resistant properties of the fire-resistant material are made effective.

"3. An insulating material comprising a hardened mass comprising asbestos fragments cemented together by a pitch having a relatively high fusing point,

the pitch being only sufficient in quantity to fill substantially the voids whereby the resistant properties of the asbestos are made effective."

"5. A non-hygroscopic, fire-proof, electrical insulating composition comprising asbestos mixed with a solution of pitch and evaporatable pitch solvent, the pitch serving in the composition, after evaporation of the solvent, as a substantially fire-proof binder and also as a non-hygroscopic coating for the asbestos, the pitch also serving to fill the voids."

"8. A compressed non-hygroscopic, fire-proof, electrical insulating composition comprising asbestos with an evaporatable solution of bituminous material which serves in the compressed composition, after evaporation of the evaporatable constituent of said solution, as a substantially fire-proof binder and also as a non-hygroscopic coating for the asbestos, the bituminous material also serving to fill the voids."

"10. The method of manufacturing insulating material which consists in dissolving a bituminous binding material having a relatively high fusing point in a volatile solvent for such material, then incorporating therewith a fragmentary fire-resisting material in such proportions that in the completed product the binding material will only be sufficient in quantity to fill completely the voids, then pressing said mass into shape and drying it.

"11. The method of manufacturing insulating material which consists in dissolving a pitch having a relatively high fusing point in a pitch solvent, incorporating therewith a fire-resistant filler in such proportions that in the completed product the binding material will only be sufficient to fill completely the voids, then molding said mass into shape and drying it."

"16. The method of making non-hygroscopic, electrical insulatng material consisting in mixing asbestos with a solution of pitch and pitch solvent; and then compressing the mixture into desired form and filling the voids, and then hardening the compressed mass by evaporation of the volatile hydrocarbon."

Appellant's commercial article, known by the trade-name "Gummon," is made by the following process:

By the use of heat coal-tar pitch is dissolved in a non-volatile heavy coal-tar oil, such as anthracene oil; to this liquid mixture is added a quantity of benzol, a readily volatile light coal-tar oil; into this is then mixed a quantity of comminuted asbestos; the compound is then pressed into molds; and the product is then placed in an enclosed oven and subjected to heat, the temperature being gradually increased up to about 500° Fahrenheit.

Appellee's alleged infringing product is manufactured as follows:

Commercial coal-tar pitch is heated from 250° to 300° Fahrenheit; it is then dissolved in a light coal-tar oil; when this mixture has cooled to about 150° Fahrenheit a certain proportion of benzol is added; after the mixture has cooled to room temperature a definite weight of china-wood oil is stirred in; this solution and short fibered asbestos are then put into a mixing machine and agitated for about two hours; after coming from the mixing machine the product is screened and placed on trays to dry from 24 to 48 hours, during which time the benzol entirely evaporates from the material; the compound is then placed in cold molds and without the application of heat is subjected to a pressure of from 4,000 to 10,000 pounds per square inch; and the molded articles are finally placed in a closed oven and subjected to heat for 24 hours, the temperature gradually being increased to from 500° to 600° Fahrenheit.

China-wood oil, above mentioned, has the characteristic when heated of coagulating into a rubber-like condition.

Charles Neave, of New York City, for appellant.
W. Clyde Jones, of Chicago, Ill., for appellee.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). [1] Is appellee's process within the teachings of the patent? In Muller's

disclosure the first step is to take mineral pitch, or its equivalent, and dissolve it preferably "at about normal temperature" in a volatile solvent, such as benzol, or its equivalent. While heat in this first step is not excluded, the patent very clearly contemplates that the bituminous material and the volatile solvent shall be of such a character that a solution will result from their being put together without extraneous heat. In other words, if heat is to be used at all, it would be only for the purpose of taking somewhat more quickly a step that could be taken without the use of heat. At the next step the fire-resisting material, such as asbestos, or its equivalent, is mixed into the solution until a consistent plastic mass is formed. This plastic mass is then placed in molds and subjected to heavy pressure "preferably in a cold state." And the final step is thus prescribed in the specification:

"The volatile ingredient of the compressed product is permitted to evaporate therefrom by exposure to air. whereupon the product is hardened by the evaporation of the solvent. If desired. the compressed mass may be subjected to heat for the purpose of hastening the evaporation."

Thus an examination of the patent makes manifest that Muller's process, in what he declared the most desirable way of practicing it, consisted in a succession of steps each of which was to be taken at normal temperature.

In the trial court oral testimony of experts was heard with regard to the results obtained by practicing the teachings of the patent. The trial judge found, and we also find, that the undisputed evidence demonstrates that the Muller process, practiced according to the teachings and disclosures of the patent and by persons both learned and skilled in the production of plastic compositions for insulating materials, produced a product which, after exposure to the air for more than a year, could be distorted by hand, was readily soluble in benzol, and when exposed to the flame of an alcohol lamp gave off visible vapors in 5 seconds, ignited in 30 seconds and crumbled in 45 seconds; and that such a product was valueless as an insulating material.

Undisputed expert testimony discloses that "a volatile solvent is one that boils at a temperature below the boiling point of water." This is true of benzol; but it is not true of the light coal-tar oil in which appellee dissolves the already molten pitch by means of heat, and without the use of heat this first step of appellee's process would be commercially impossible. The subsequent addition of benzol is necessary to thin the mixture so as to offset the coagulating tendency of the china-wood oil. And when the asbestos has been mixed in and the composition has been screened and placed on trays to dry, the benzol entirely evaporates from the granular mass, and not from the molded article as in the process of the patent. In appellee's process heat is absolutely necessary in order to bring about the rubberization of the china-wood oil. Furthermore, the final subjection of the molded article to heat is essential for the expulsion of the light coal-tar oil in which the molten pitch was primarily dissolved, and finally the prolonged subjection to the increasingly high degree of heat in a closed oven is requisite to the hardening and the rendering unin-

flammable of the finished product by volatilizing and driving off the heavier oils that remain in commercial pitch and which volatilize at from 500° to 600° Fahrenheit.

Appellant learned to make "Gummon" from Muller in a factory in Germany. If Muller, when he wrote the specification of his patent, had already developed the "Gummon" process, in which the anthracene or other heavy coal-tar oil is not vaporizable without a high degree of heat and in which the non-vaporizable residue of the anthracene oil acts somewhat in the finished product as china-wood oil does in appellee's product, he carefully refrained from giving the necessary recipe for making the product; and if the process claims in suit have any vitality, if the patent for the process is not void on account of vagueness and inadequacy of disclosure (Western Electric Co. v. Ansonia Co., 114 U. S. 447, 452, 5 Sup. Ct. 941, 29 L. Ed. 210), we are quite convinced that appellee does not infringe.

[2] Though claims for a new product which has definite characteristics by which it may be identified and which distinguish it from the process by which it is made, are not limited to the product as made under the disclosed process (Rubber Co. v. Goodyear Co., 9 Wall. 796, 19 L. Ed. 566; Hide-ite Leather Co. v. Fiber Co., 226 Fed. 34, 141 C. C. A. 142), nevertheless product claims are not sustainable unless the specification discloses at least one practicable way in which to make the product.

The decree is affirmed.