## SKY WRITING CORPORATION OF AMERICA v. PHILLIPS PETROLEUM CO.

### SAVAGE v. SAME.

### Nos. 6411, 6412.

Circuit Court of Appeals, Seventh Circuit.

May 28, 1938.

George A. Chritton and Clement J. Wall, Jr., both of Chicago, Ill., and W. Lee Helms, of New York City, for appellants.

Wallace R. Lane and George Mankle, both of Chicago, Ill., and T. B. Hudson and D. L. Conner, both of Bartlesville, Okl., for appellee.

Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff Savage brought suit for infringement of two patents, Reid No. 1,621,482 applied for May 5, 1920 and issued March 15, 1927, and Savage No. 1,489,717 issued April 8, 1924 upon application filed August 31, 1923. In a second suit, plaintiff Sky Writing Corporation of America sued for infringement of patent No. 1,514,106 to Savage applied for June 30, 1922 and issued November 4, 1924. The two cases were tried as one, resulting in a decree dismissing each bill for want of equity, and they are presented to this court upon a consolidated record. The District Court found the first two patents invalid and the third not infringed.

The three patents are alleged by plaintiff to cover three mental concepts, resulting in the perfection of the art of commercial skywriting by aircraft. Reid purports to cover any method of so maneuvering an aeroplane as to form designs in the air with visible substance, given off from the exhaust or from a container carried by the plane. Claim (1) relied upon in this respect is as follows: "In a system of advertising, the method of establishing designs in the air, which consists in maneuvering an aeroplane, giving off a visible substance in such manner that the path of said aeroplane, as defined by said substance, forms the desired design." Claim (4), also relied upon, attempts to claim as a product any design made from and by aeronautical craft. It is as follows: "As an aeronautic product, an advertising sign comprising a combination of alphabetical letters, words, or a design, composed of smoke suspended in the air and in form readable with the naked eye by persons distant on the earth."

The first Savage patent covers a method of forming designs in the air, characterized as a method of horizontal transcription of the letters backward. Claims (1) and (6) relied upon are as follows: "1. The method of forming advertising signs comprising combinations of letters by means of an aeroplane whilst emitting therefrom a trail of persistently visible material, which consists in producing the first letter at the extreme right of the sign, viewed from above, by flying the backward outline of said letter in substantially a horizontal plane whilst emitting the visible

material, positioning the aeroplane to the left of the said letter and producing each of the successive letters by backward substantially horizontal transcription." "6. The method of forming advertising signs comprising combinations of letters by means of an aeroplane whilst emitting therefrom a trail of persistently visible material, which consists in flying the aeroplane in the backward outline of each letter in substantially a horizontal plane whilst emitting the visible material."

The second Savage patent covers an apparatus consisting, as defendant insists, of two separate chambers so arranged with respect to each other as to increase the available heat from the exhaust so that it may be used in creating smoke with which to make designs in the sky and a method resulting from utilization of an apparatus having a second or preheating chamber. Plaintiffs insist that the Savage patent is not restricted to the use, in the exhaust pipe, of a separate and additional enclosed chamber for receiving the smoke forming oil. The two claims relied upon are Claims (1) and (5) as follows: "1. In a motor driven aircraft, means for producing visible trails for aerial advertising or other purposes, comprising a chamber in close proximity to the exhaust passages of the aircraft motor to receive heat from the exhaust gases, a second chamber for containing a trail producing material, means for effecting a passage of said material from the second to the first chamber in which the heat is utilized to effect a production of the visible trail from said material, and means for discharging the visible trail into the atmosphere." "5. The method of issuing a smoke trail from a vehicle propelled by an internal combustion motor, comprising: directing the motor exhaust gases in contact with a heat convecting element which absorbs heat from said exhaust gases; and bringing a smoke producing substance into contact with said heat convecting element."

Reid in Claim (1) asserted invention in a method of establishing a design in the air, consisting of maneuvering an aeroplane, giving off a visible substance, in such manner that the path of the aeroplane as defined by the substance, formed the desired design. In his specifications, as they exist now subsequent to disclaimer, Reid said that he released "the exhaust or other escape from the engine, or smoke, gas, vapor or other chemical from a container" and then "maneuvered the machine while emitting the exhaust or liberating the gas, vapor or other chemical or like fluid or liquid to give the configuration of a letter, figure and the like." He said that he might "shut off the exhaust from the engine or the fluid from the container and pass through the air and liberate the fluid in space at any altitude and maneuver the machine to produce the second letter configuration." Thus, in its essence, this claim purports to patent successive configuration of separate letters, the smoke being shut off between each of them so that the aeroplane will leave no trail between them. It was obviously his purpose to control the supply of smoke, liquid or chemical product, as it was thrown into the exhaust tank and then out into the air, in such manner as would permit the operator to cut off or open such supply at his will. Plaintiff distinguishes Reid's method from the prior art by saying that it was necessary under his method to form one letter, shut off the smoke, then pass through the air in a maneuver to reposition the plane, then turn on the smoke for the successive letter, following this procedure until the completion of the word or design. It is insisted that none of the prior art suggests any method other than continuous emission of smoke.

Means, upon an application filed July 1, 1908, received Patent No. 922,709, issued May 25, 1919. He stated that his invention related to a signalling system and that his object was "to provide a system whereby signals might be transmitted automatically or otherwise" from an aeroplane. He provided a tank for holding a suitable coloring matter, which emptied into the exhaust pipe of the engine through a tube, the flow being controlled by suitable valve or valves. He used "any suitable coloring material," such as "carbon particles suspended in a liquid," for imparting to the exhaust of the motor a distinctive color. In his suggestions, he included substances "readily ignitible by the hot gases" of the motor exhaust and utilization thereof to produce flashes of color at night. He said that, by means of his invention, the operator would be able, automatically or otherwise, to transmit signals such as the Morse code to other machines or to the earth. He mentioned that, in order to produce intelligible signals, he had provided means for controlling the valve in accordance with the signals to be transmitted; that he had shown an automatic transmitter, controlled by the opening and closing of an electric circuit, but that any other suitable type of

transmitter might be used. He also suggested a transmitter of the ordinary Morse key type to control the supply of coloring intermittently. He said that it would be obvious that any predetermined signal might be transmitted automatically, by darkening the exhaust from the motor for long or short periods, corresponding to the dashes and dots of a telegraphic code and that the signals so produced would be outlined against the sky and readable by means of a field glass at a distance. He suggested that at night he might use any pyrotechnic material suspended in suitable liquid so that by the operation of the valve through the transmitter, the pyrotechnic material would be supplied at varying intervals of time, furnishing a substance readily ignitible by the hot gases of the exhaust of the motor to produce thereby flashes of color or other trail marks. He advised that by means of his invention, the operator would be enabled automatically or otherwise to transmit signals and that the control of the supply of the coloring or material might be effected in any other suitable manner.

He claimed, in an aeroplane, "the combination with the motor exhaust pipe of means for introducing into the latter matter for imparting a distinctive color to the exhaust and a transmitter for controlling such means." He prescribed "a vessel containing means for darkening the exhaust, a tube or conduit connecting the vessel with the exhaust pipe, a valve in the tube and a transmitter for controlling the valve."

This patent the corporate plaintiff purchased in 1923. It brought suit in the United States District Court for the Southern District of California against Rogers Aircraft, Inc., for infringement. In its bill plaintiff then said that defendant there had infringed Means by equipping its aerial machine with a signalling system, comprising in combination a vessel or tank, adapted to contain a coloring matter, with a pipe leading from such vessel to a suitable nozzle for discharging from the aeroplane coloring matter to form signals, the nozzle being provided with a valve by which the outlet of such coloring matter could be controlled, and a transmitter, consisting of a suitable operating rod and connecting means within reach of the operator or driver of the aeroplane, by which transmitting means the valves could be operated at the will of the driver to control and determine the outlet of coloring matter and to produce the desired signals; that defendant had operated its machine so

equipped with suitable coloring matter, to-wit, titanium tetrachloride, to produce signals in the air.

Plaintiff filed interrogatories in that suit directed to defendant requiring it to state what method it had used in skywriting and defendant replied that it had equipped its aeroplane "with a tank adapted to contain smoke producing matter with a pipe leading from the tank to a nozzle for discharging from the aeroplane such smoke producing matter," the "nozzle being provided with a valve by which the outlet could be controlled," the valve being operated by the driver and that the apparatus thus provided, "produced smoke in the air in the form of letters and words."

The court found that this action constituted infringement of Means, saying: "There is no doubt but that the invention of Means was a pioneer and basic one. No one before him had provided mankind with an instrumentality whereby definite, positive, persistent, usable, visible signals could be projected in and from the sky, so that they might be observed and taken advantage of by others either in the sky or upon the earth. * * * Claim 4, the one relied upon herein, is a broad combination claim, and secures to Means and his assignees the monopoly of any sort of signalling or skywriting from an aerial machine by means of the use of coloring matter the output and deposit of which and therefore the visibility of which, is controlled and determinable by a valve operated in accordance with some predetermined purpose." Skywriting Corporation of America et al. v. Rogers Aircraft, Inc., et al., D.C., 300 F. 998, 999. The court found, therefore, that no one before Means had provided any system whereby definite positive visible signs could be projected in and from the sky so that they might be observed either in the sky or on earth. It found that Means' claim was for a monopoly of any sort of signalling or skywriting from an aerial machine by means of the use of coloring matter, the output of which was controlled and directed by a valve operated by the operator in accord with his predetermined purpose.

■ We are unable to distinguish between the accomplishment of Means and the subsequent claims of Reid. Plaintiffs admit that the Means apparatus is capable of use in performing the Reid method and that it could be used for performing skywriting, "although not with the full utility and advantages of the still later Savage

heat patent," the second Savage patent. Means, they say, furnished the apparatus, but not the method of Reid. But plaintiff has procured by its decree in the California suit a determination that Means' patent covered a monopoly of skywriting by coloring matter, the supply of which was controlled by a valve operated by transmitters manipulated by the operator. It cannot be said that Means did not teach such control, for this element is repeatedly discussed throughout his specifications. It was not new for Reid to provide control and to distinguish between a continuous supply of coloring matter and a supply which could be shut off or turned on at the will of the operator. Means had already so advised the world. If Means did not completely anticipate Reid, he did give information that would teach any mechanic skilled in the art how to do all that Reid accomplished. Reid's method over Means could be nothing more than skillful maneuvering of his plane.

What we have said is applicable to the product claim as well as the method claim. We find it unnecessary to decide whether it is possible to have a valid product patent for so nebulous a thing as a smoke sign in the sky, for to us it seems clear that such product resulted inevitably from Means' operation as well as from the skywriting exploits of individuals shown in the prior uses. Means described a system whereby he brought into existence a product consisting of a reproduction of a predetermined design in the air. Whether it consisted of letters, Morse code or fanciful figures, his product was that resulting from the practice of his system and the world had full information from his patent concerning it. It was too late for Reid to claim the product.

We think Means completely decisive upon the question of validity of Reid, but in addition there was evidence of skywriting by aeroplane operators. Thus, Lincoln Beachey in 1915 at the Panama Pacific International Exposition in San Francisco, California, signed off by writing his initials "L.B." with smoke from his aeroplane. He was succeeded, upon his death in March of that year, by Art Smith, who contracted with the Metro Picture Corporation to write the word "Metro" in the sky to advertise its business and did so. According to the evidence he also wrote "Art Smith," "Farewell" and other signs and figures. Smith prepared a patent application which

was never filed. This application, included a sketch showing his manner of attaching smoke pots and fire flares or Roman candles to his ship, and the specifications prepared at that time contained the statement that even the writing of words could be accomplished in fire and that he had successfully used the apparatus for legibly writing simple words. Katherine Stinson in 1915 at Los Angeles did skywriting, there being a photograph in evidence of the word "Cal," for California. DeLloyd Thompson wrote his letters "G.W" over the Washington Monument in 1916. His picture in a paper is accompanied by the statement, "He Dives from the Clouds and Writes in the Sky."

To be sure none of this writing was perfect. The practice was apparently yet in its infancy. But the idea of writing designs, signs or signals, with intermissions between them was known to the art prior to Reid's application. Apparently everything that Reid did was taught by the prior art.

■ The first Savage patent claims a method of producing advertising signs of smoke in the air by forming the letters substantially in a horizontal plane and by writing the letters backward, that is to say from right to left. It is asserted that this method brings about more rapid and accurate production of the sign and visualization by a greater number of people than any other. Defendant contends that the claims necessitated flying the aeroplane in the backward outline of each letter in substantially a horizontal plane, but we think this construction is rather forced. Obviously, in making his letters in the backward method prescribed, Savage sometimes made the letter forward, sometimes backward. It is clear that at all times he so maneuvered his plane as to bring about the most feasible efficient production of signs with the least possible lost motion.

We are unable to discover in this method by Savage anything in the nature of invention. The evidence shows that Beachey wrote his initials "L.B." horizontally in the air, backward or upside down, as viewed by Beachey, but forward and rightside up as viewed by the observer from the ground. The same is true as to other prior operators who did skywriting. But it seems perfectly obvious to us that any operator must immediately comprehend that when he is producing a sign in the sky to be read by those on earth, he is in exactly the same situation as a painter who paints a sign on

the inside of a glass door to be read by those who approach the door from the outside. Such a sign must be painted backward, that is from the right of the sign painter to the left, so that the reader facing the sign painter will begin his reading in the natural manner at his left and read thence to the right. Obviously if the skywriter began at his own left and wrote to the right, he would have to begin with the last letter of his predetermined sign and the reader would be unable to determine what was written until the entire design had been completed. When Savage suggested that the skywriter must begin at the right and in general write each letter backward, he was doing what other delvers in the art had done; he was doing that which the ordinary sign painter must know was essential to produce legible writing to those on the ground. This was not invention. When he specified the maneuvering of his plane in such manner as to produce each letter consecutively with the least possible flying and in the most efficient manner possible, he was doing only that which any skilled flier must know was desirable.

██ The second Savage patent No. 1,-514,106 is owned by the corporate plaintiff. The patentee said that his invention related to the formation of smoke or other visible trails for aircraft for signalling, advertising and other purposes and that his main object was to provide improved means for the forming of required trails. He prescribed an apparatus consisting of a container for the storage of the material used for the production of the smoke trail, connected, by means of a pipe line and valves, either with an outer jacket on the exhaust pipe, heated by the exhaust gases, or a similar jacket within the exhaust pipe. Such jacket, he said, should either lie in the interior of the exhaust pipe or be arranged around its exterior and so designed that a maximum amount of heat would be available to cause reaction or vaporization of the smoke producing material. He said that the additional jacket should be fitted internally with baffles or packed with refractory material to insure that the smoke producing material would be intimately heated for such a time and at such a temperature as to complete the desired reaction or vaporization. He suggested a variety of smoke producing materials, mentioning specifically anthracene oil or other similar fluid; a complex liquid, such as a mixture of a suitable hydrocarbon and an organic chloride in suitable proportions with or without other liquids; a simple solution, such as naphthalene in turpentine; a complex solution; a mixture of complex solutions or any of the aforementioned with solid matter, held in suspension. He claimed in a motor driven aircraft, a chamber in close proximity to the exhaust passages of the motor to receive heat from the exhaust gases; a second chamber for containing a "trail producing material"; means for effecting passage of said material from the second to the first chamber, in which the heat is utilized to effect a production of the visible trail from said material; and means for discharging the visible trail into the atmosphere.

Defendant insists that, under his specifications and claims, if Savage made an invention, it was one in which he utilized two chambers. If he did not do so, it says, he was anticipated by the prior art and his invention must be given the narrow scope over the prior art, in order to be held valid, of suggesting not only the container of the prior art, the tube thence to the exhaust pipes and means for controlling the outlet but, in addition, a second chamber within or without the exhaust pipe, so arranged as to intensify the heat passing through the exhaust and to produce vaporization or reaction of the trail marking material. Defendant insists further that its alleged infringing device is not within Savage; that it has no second chamber but empties its trail marking material into the exhaust pipe just after the same leaves the exhaust manifold. Defendant insists, too, that the history of the file wrapper discloses that Savage was compelled by cancellation of his broad claims, to rely entirely upon limited claims which specified two chambers, that is, included an additional preheating chamber.

An examination of the file record is persuasive of the correctness of this position. Claim (1) of the application originally filed did not specify a separate preheating chamber. It was cancelled and amended claims were offered in which a preheating chamber was specified. However, the specifications were not amended. It seems apparent, therefore, that the patentee inserted the additional element in his combination claim in order to avoid anticipation. The element) thus added became a vital part of his claim and the specifications describing the elements of the cancelled claims cannot be relied upon to enlarge the claim finally allowed, narrowed by the inclusion of an additional element. Smith v. Magic City

Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707; Keystone Driller Co. v. Northwest Engineering Corp., 294 U.S. 42, 55 S. Ct. 262, 79 L.Ed. 747.

Irrespective of this situation, with regard to Savage's claims and their construction, however, it appears that Sperry in No. 1,426,338, who provided writing equipment for making signs and signals in the air by passage of smoke, fumes or vapors, disclosed a separate preheating chamber extending into the exhaust pipe. This was spoken of as a valve, but his description teaches that it performed functions far beyond those of a mere valve. He said that the heat from the exhaust maintained the valve and adjacent parts at sufficient temperature to prevent the hydrated chloride from precipitating on and into the valve and clogging it. This element was threaded into an opening in the exhaust pipe and extended down into the exhaust pipe, so that the heat from the exhaust gases surged around it and preheated the smoke-making material contained therein before the valve was opened and the material allowed to pass into the exhaust through the valve door.

We believe that, with the teaching of the prior art before him, Savage, in this patent, had all the information therefrom sufficient to teach everything he did as a skilled aviator. It was old to pass the smoke producing material through a valve controlled by the operator into an exhaust pipe and thence into the open air. Whether the heating of the exhaust pipe caused a chemical reaction or a darkening of the material is of no importance, for it is not claimed that Savage prescribed any specific material; the choice from many materials was that of any delver in the art. If a material were chosen which required additional heat, more than would have been supplied by the ordinary flow of the exhaust gas, it was obvious to any mechanic that to obtain such additional heat, it would be necessary to place an extra chamber within or without the exhaust pipe and retard the heated exhaust gas therein long enough to produce the desired preheating. This was a problem to be solved by the mechanic who needed more heat for the proper preparation of his trail marking material. Furthermore Savage was anticipated in this thought by Sperry's suggestions. We believe the patent void for want of invention.

Furthermore, if Savage is to be held to his limited claims, as the authorities prescribe, there is no infringement.

We have considered this record carefully. It has to do with the annals of the years when the operators of aeroplanes were beginning to realize the possibilities of commercial utility in producing signs in the air. Obviously the writing of such signs is not an easy matter. It is the result of clever manipulation of an aeroplane by a skilled aviator. But the difficulty and the lack of ease with which the task is fraught arises, not from the complexity of concepts involved but from the scene of action, the environment in which the work is done. Such difficulty is overcome not so much by invention as by the daring and the skill of the men who manipulate their aeroplanes in looping backward and forward and otherwise to the amazement of those upon the ground.

We conclude that all patents are invalid for want of invention. The decree of the District Court is

Affirmed.