**RICHMOND SCREW ANCHOR CO. v. UMBACH.**

No. 9641.

United States Court of Appeals Seventh Circuit.

Jan. 18, 1949.

As Amended on Denial of Rehearing March 15, 1949.

Writ of Certiorari Denied May 31, 1949.

See 69 S.Ct. 1161.

---

Fred Gerlach and Norman Gerlach, both of Chicago, for appellant.

Victor E. La Rue, Eugene A. Tappy and Ruth L. Leffler, all of Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, SPARKS, Circuit Judge, and LINDLEY, District Judge.

MAJOR, Chief Judge.

This appeal is by the defendants from an adverse judgment, entered April 21, 1948, upon Count I of a complaint which charged infringement of certain letters patent owned by the plaintiff. An appeal from a judgment on Count II of the same complaint is disposed of in appeal No. 9642, in an opin-

ion filed simultaneously with that of the instant case. Richmond Screw Anchor Co. v. Umbach, 7 Cir., 173 F.2d 532. As will be noted from that opinion, defendants were authorized by a license to use the patents now found to be infringed, until January 20, 1945, the date of the termination of the license agreement. Therefore, the infringement found covers only the time subsequent to that date.

The patents in suit all relate to tie rods and parts thereon for supporting forms used in constructing concrete walls. They were all issued to Tamis C. Schenk, and on the date of issuance each patent was assigned to plaintiff. The patent number, the date of issuance and the subject matter of each, as alleged in the complaint, are:

| No. | Date Issued | |
|---|---|---|
| 1,857,610 | 5-10-32 | "For an invention in a Form Tie" |
| 1,919,751 | 7-25-33 | "For an invention in a Wedge for Form Ties" |
| 2,020,912 | 11-12-35 | "For an invention in a Form Tie" |
| 2,107,130 | 2-1-38 | "For an invention in a Means for Preventing the Formation of Continuous Voids in Concrete Masses" |
| 2,162,592 | 6-13-39 | "For an invention in a Form Tie" |
| 2,222,339 | 11-19-40 | "For an invention in a Form Tie" |

The court below adopted findings of fact verbatim as proposed by the plaintiff and upon such premise concluded that all the six patents in suit were valid and that all were infringed by the defendants except the first and last (as above designated) and that there was no infringement as to them. The issue here arises as the result of the defendants' contention that all the patents in suit are lacking in invention and, therefore, invalid, and that in any event there has been no infringement by the defendants.

Tie rods for supporting forms used in the construction of concrete walls were extremely old in the art. This is shown by scores of prior art patents introduced by the defendants and relied upon as anticipating or showing a lack of invention in the patents in suit. There are many prior art patents which disclose, as do the patents in suit, ties extending through the form walls and the concrete, spacers for holding apart the sides of the form for the concrete, devices for holding the walls on the ties during the pouring of the concrete and means to break off the projecting ends of the ties after the concrete has set. The devices of all the patents in suit relate to ties, spacers and tie-holders, and it is contended by defendants that they utilize these old combinations of elements so as to perform the same old functions and to obtain the same or similar results.

The patents in suit include the following elements: (1) a tie rod or bar adapted to extend through the form for the concrete; (2) spacers on the tie for holding apart the sides of the form; (3) holding devices for securing the sides of the form on the rod, and (4) break-off points on the rod which permit the ends of the rods, projecting from the set concrete, to be broken, cut or twisted off.

Ties of different shapes—round wire and flat bars—were old. Spacers on the tie rod for the concrete form, in a wide diversity of detail, were old. Holders on the ties for the sides of the form in the form of wedges, screws, welded and integral members were old, as well as means for twisting or breaking off the rod in the concrete after the latter had hardened.

As we understand, the patentable status claimed for each of these inventions resides in an improvement represented by a single element claimed in combination with old elements. And by the addition of such element an improvement of patentable status is asserted over anything theretofore disclosed. The defendants contend that the improvement in all the patents is to be found in the prior art and therefore anticipated, and that in any event the dis-

closures do not represent invention over such art.

As we understand, plaintiff does not dispute but that the elements relied upon as patentable invention are found in the prior art, but its main contention is that the patents in suit are not anticipated because the improvements disclosed in connection with other elements claimed are not all shown in a single prior art patent. It accuses defendants of "piecemeal anticipation," that is, by adding separate elements found in various prior art patents so as to produce the combinations claimed.

The court below apparently was impressed by this argument which it incorporated in its findings of fact in substantially the same language as to each of the patents in suit. Typical thereof, the court found as to patent No. 1,857,610:

"Defendants could not name any patent that shows all the structures or operations of the plaintiff patented Form Tie or Snap-Ty—an argumentative acknowledgement that they could not name an anticipation. The Court finds that no patent which defendants name anticipate the disclosures of the patent in the suit and it discloses invention over each and all of the patents cited by the defendants."

This finding specifically incorporating plaintiff's argument results in an argumentative finding which relegates it to the position where it has little, if any, value in support of the court's conclusion of validity.

Plaintiff cites a number of cases in support of its urgent contention that all the elements of a combination claim or their mechanical equivalents must be found in a single prior art patent before there can be anticipation. Bates v. Coe, 98 U.S. 31, 48, 25 L.Ed. 68; Chicago Lock Co. v. Tratsch, 7 Cir., 72 F.2d 482, 487; Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, 506. No good purpose could be served in discussing such cases. Certainly it cannot be doubted that the entire prior art may be looked to, and the mere fact that some of the elements of a combination claim are found in one prior art patent and other elements in another does not render such art impotent as a guide for ascertaining novelty. There still remains the all-important question as to whether the combination of such elements amounts to a patentable invention or whether it might reasonably be expected of a mechanic or a person skilled in the art. Florsheim v. Schilling, 137 U.S. 64, 77, 11 S.Ct. 20, 34 L.Ed. 574; Daylight Glass Mfg. Co. v. American Prismatic Co., 3 Cir., 142 F. 454, 456; Jacobs Mfg. Co. v. T. R. Almond Mfg. Co., C.C., 169 F. 134, 139.

## Patents No. 1,857,610 and No. 1,919,751

These two patents may appropriately be considered together because of defendants' contention that the invention asserted for the latter is covered by the former and constitutes "double patenting." If it were not for this situation, little, if any, attention need be given to the former because, while the court held this patent valid, it also held that it was not infringed, and further, it will expire May 10, 1949. In fact, plaintiff contends that the question as to its validity has become moot. This is perhaps true, but in view of defendants' contention that it covered the invention asserted for No. 1,919,751, we think a consideration of both patents is desirable.

Plaintiff relies upon claims 1, 2 and 5,[1] of No. 1,857,610, and claims 1 and 2 of No. 1,919,751. Claim 1 of the latter is illustrative for the purpose of the question to be determined.[2]

[1] "1. A form tie having a stop welded thereto against which a form may rest, and means for holding a form against the stop, the weld making the tie brittle at the point of the weld without decreasing substantially the tensile strength of the form tie, the weld making the tie easily breakable when bent at the weld.

"2. The substance of claim 1 characterized by a holding means composed of a bottom-heavy wedge.

"5. A form tie of claim 1 characterized by brittleness within a concrete wall after use so that it may be broken within the wall."

[2] "1. A bottom-heavy wedge for form ties having spaced walls defining a slot between them, said walls having outer parallel surfaces which diverge from the inner surfaces of said walls to the top of the wedge, a loop at the bottom of the walls connecting said walls and enlarging the lower end of the slot so that the

In the former, we have difficulty in discerning what is relied upon as constituting invention. We need not cite any prior art for the proposition that a form tie having means both on the inner and outer side of the form for holding it in place was old. In fact, the patentee states in his specifications, "My improved form tie may be used with any suitable form, which may consist of longitudinal boards re-enforced by horizontal beams and vertical beams, all of which are used in the conventional manner." The sole novelty which can possibly be claimed for this patent is the manner of fastening the inner support member referred to as a "stop" by welding it to the tie rod so as to make the rod brittle at the point of the weld, and thereby easily breakable at that point, without substantially decreasing the tensile strength of the rod. In fact, this feature of brittleness is specifically relied on in claim 5. Claim 2, in addition, has specific reference to the outer means of support for the form, which is described as a "bottom-heavy wedge." It is this disclosure which defendants contend is included in No. 1,919,751, and which invalidates the latter.

Defendants cite numerous prior art patents which disclose, so it is asserted, the welding of a support member to a tie rod. Either with or without any prior art, the process of attaching two metals by welding is so old and well known as to preclude the thought that its use could constitute invention. The sole novelty which might reside in claims 1 and 5 is that the weld is accomplished by means which produce a brittleness in the rod, thereby making it more readily severable at that point when the form is removed.

◼ As shown, however, by the testimony of plaintiff's president, Snyder, the method by which this brittleness is obtained is rather complicated, and its proper exercise depends upon numerous things, such as the heat pressure, type of steel, timing, voltage, none of which are disclosed; in fact, the witness admitted that to do so would be to disclose the secrets of the business. We think in this respect that

claims 1 and 5 fail to meet the requirements of Sec. 33, Title 35 U.S.C.A., and are void for that reason. See Hemming Mfg. Co. v. Cutler-Hammer Mfg. Co., 7 Cir., 243 F. 595, 600; Health Products Corp. v. Ex-Lax Mfg. Co., 2 Cir., 22 F.2d 286, 287.

Plaintiff in its bill of particulars charged that defendants' tie rods with wedges infringed claim 2 of No. 1,857,610, and the claims of No. 1,919,751, but after the defense of "double patenting" was raised evidently realized the inconsistency of its position and the charge of infringement as to claim 2 of the first patent was abandoned. Now, in order to escape the contention as to "double patenting," the gist of its argument is that the provision in claim 2 for a "bottom-heavy wedge" really added nothing to claim 1. If such be the case, claim 2 must be invalidated for the same reason as claim 1. It is argued that the claims of the latter patent describe a wedge in detail, while claim 2 merely includes the wedge in connection with other elements of a tie rod. The latter patent does not expire until more than fourteen months after the expiration date of the former; hence, if the latter is valid, plaintiff's monopoly is extended for that length of time. It might be reasonably contended, we think, that the mere inclusion of the wedge in claim 2 does not spell invention or add anything to claim 1, but when that element is considered in connection with the drawings and specifications, it is plain that the wedge referred to in this claim is the identical wedge described in the claims of No. 1,919,751. Plaintiff in its brief states, with reference to the claims of the latter patent, "The drawing and the specifications of Schenk Patent No. 1,919,751 for the Wedge for Form Ties were lifted bodily and taken from Schenk Patent No. 1,857,610, leaving therein the tie rod." This is hardly an accurate statement. It is true that the same drawings and specifications are shown in the second patent but they were not removed from the first patent; in fact, they were left there in their original form, so the drawings and specifications in each patent, insofar as the wedge

---

enlarged end of a form tie may be passed through the loop and the weight of said

loop will tend to hold the wedge in a vertically disposed position."

is concerned, are identical. Thus, all that was claimed in No. 1,919,751 is disclosed in No. 1,857,610. When the drawings and specifications of the latter patent are taken into consideration, we find the identical wedge described in the claims in No. 1,919,751. Plaintiff in its brief states, " * * * there are two separate and distinct devices, the Tie Rod and a wedge combination and the Wedge standing alone," but it is the wedge combination which gives to claim 2 a patentable status, if such it has, and it is precisely the same wedge as is described in the claims of the other patent. And the testimony of the witness Snyder shows the wedge called for in one patent as the same wedge described in the other patent.

■■ It has been frequently held that a second patent must be for an invention separate and distinct from that claimed in a former patent and that mere differences in the scope or language of the claims do not constitute a separate and distinct invention. Miller v. Eagle Mfg. Co., 151 U.S. 186, 198, 14 S.Ct. 310, 38 L.Ed. 121; Caldwell v. Firestone Tire & Rubber Co., D.C., 13 F.2d 483, 488, affirmed 2 Cir., 23 F.2d 1000; Palmer Pneumatic Tire Co. v. Lozier, 6 Cir., 90 F. 732, 744. Plaintiff attempts to distinguish these cases, but the distinction is on the facts and not the principle announced. We think the conclusion is inescapable that the patentee disclosed nothing in No. 1,919,751 that had not been fully disclosed in No. 1,857,610, and for that reason we must hold it invalid.

### Patent No. 2,020,912

This patent, like those previously considered, is for an improvement in the form ties for concrete construction. It has four claims, all held to have been infringed. Claim 3 [3] is illustrative. The stop referred to in this claim as an "enlargement of the diameter of the body of the rod" is referred to in other claims as "a pair of spaced collars integrally formed on the rod." The specification states:

"More particularly, the invention comprises a form tie made from a metal rod and provided with weakened points which are located within the concrete structure after the wall has been poured, the rod being then broken off at these weakened points with the portion of the rod between the weakened points remaining within the wall and covered by the concrete after the wall has been pointed."

The improved result claimed for this patent resides in the means shown for breaking off of the rod a short distance from and within the face of the concrete. Plaintiff in its brief states:

"It is desirable to snap the tie in back from the face of the concrete wall, say one inch back into the wall, and if you don't, snow and other things will get into the resulting hole or rust from the tie itself will get over the face of the wall. It is not good looking. After a while the wire rusts out and leaves within the wall an opening."

As already shown, the patentee in his previous patents provided for the break-off at the face of the concrete or at the point where the form stop member was welded to the rod, which was designedly weakened at that point for such purpose. Here, the break-off point is moved back inwardly from the face of the concrete so that when the rod is broken and removed there will remain a hole extending inwardly from the face of the concrete which can be filled after removal of the rod. The question is whether the means shown to produce such a result is of patentable status. As appears from plaintiff's brief, the combination of three elements are relied upon, (1) the break-off, (2) the washers, and (3) the integral collars.

The application for this patent met rugged resistance from the examiner. It was filed May 31, 1934, and not allowed until November 12, 1935. The claims were re-

---

[3] "3. A form tie consisting of a rod having weakened break-off points, the rod being provided with end portions extending from said break-off points adapted to be broken off by twisting movement about the longitudinal axis of the rod, stops on said end portions consisting of parts formed by enlargement of the diameter of the body of the rod without weakening said rod, and washers adapted to be held against said stops, the end portions of the rod being freely movable within the washers while said end portions are being twisted."

jected over the prior art at least four times. They were amended on numerous occasions as to matters which appear to be rather immaterial in view of the argument which is now made. Each time the claims were rejected, a new argument was presented by the patentee or his attorney in the form of an affidavit as to the merits of his invention in contrast to the prior art, and the examiner appears not to have been too certain when the claims were finally allowed. As to claims 1 and 2, he stated that they were "deemed allowable over the art of record," and as to claims 4 and 5 that they were "apparently allowable over the art of record." It is open to question whether the examiner finally gave his approval because of the merits of the invention or whether he succumbed to the persistency displayed by the patentee.

Without attempting to review the extensive file wrapper history, it appears that the main controversy between the patentee and the examiner was whether the rod was strengthened at the point of the location of the spaced collars, which feature was strenuously urged in the Patent Office. On one occasion the patentee, in response to the examiner's rejection, stated, "It is this formation of the collar on these rods, without in any way weakening the rod, which constitutes one of the novel features of applicant's invention. Heretofore whenever a stop was formed on a rod, by forcing this stop out of the metal of the rod, a weakened part was provided at the point where the stop was produced. * * * Applicant, while providing an integral stop on his rod does not weaken the rod where the stop is located and consequently does not create a weakened point at the outer faces of the wall." On another occasion, in urging this feature, the applicant stated, "As far as welding a stop on the rod is concerned, the only one who shows this arrangement is applicant's prior patent [No. 1,857,610, heretofore discussed], which by the welding operation weakens the rod and causes it to break off at a certain point. Applicant's particular stop strengthens the rod at the face of the wall and increases the tendency of the rod to break off well within the wall when the rod is twisted."

Pinaud patent No. 2,095,714 appears to be the most pertinent of the many prior art patents relied upon by the defendants. Pinaud, in our judgment, comes close to being a complete anticipation. It discloses a tie rod, integral collars or upsets on the rod, and washers engaging the stops and the inner side of the form; slitted portions of the rod in the body of the concrete at which the ends of the tie are broken off. It shows a flat washer maintained against upsetting portions formed on the rod. There, as here, the rods are twisted off within the body of the concrete, the spacers or upsets integral with the rod and the washers are spaced on the rod by the upsets. The Pinaud patent was not cited by the Patent Office.

Plaintiff in its attempt to distinguish Pinaud emphasizes what we have already referred to as the essential element relied upon for invention in the instant patent by pointing out that in Pinaud the upset in the rod is formed in such manner as to weaken the rod at that point. Pinaud, however, evidently recognized the importance of not weakening the rod at such point because he states that the upsets may be formed in any suitable manner, and are "preferably such as to avoid unduly weakening the rod." Plaintiff also points out that in Pinaud the washers are firmly attached to the rod, while in the instant patent the washers are loose so as to be rotatable. Pinaud, however, in his specification states, "In Figs. 12 and 13 there is shown a construction in which a flat washer 53 is maintained against longitudinal movement by means of upsetting portions 54 formed on the rod." It thus appears that Pinaud treats washers welded on the rod and washers held by upsets as equivalents. Moreover, if the washer is welded to the rod so as to serve as a stop member, we discern no purpose for a collar or upset which performs the same function.

In patent No. 1,857,610, as heretofore shown and discussed, the claimed invention was supposed to reside in a stop member welded to the rod so as to weaken it at that point. To accomplish this result the patentee employed some kind of a secret process for producing brittleness in the rod.

Here, the distinguishing feature is a stop member designed to strengthen the rod. This apparent inconsistency arises from the fact that in the former the break-off is intended to be at the point where the stop member is attached, while in the instant patent the break-off is intended to be inwardly from the stop member. But just as the patentee in the former patent failed to disclose the process by which the brittleness or the weakness of the rod was produced at the point where the stop member was attached, in the instant patent he fails to disclose the process or method by which the rod is strengthened at that point. Snyder, with reference to this feature, testified:

"Q. Then there is no disclosure of any die mechanism which could be utilized in order to obtain or show how to make the integral collar? A. Any machinery company would show you how to make a collar.

"Q. Is there any disclosure of the dies for that purpose in this patent? A. I don't think it's necessary in a patent.

"Q. But you do believe any machinist could design a set of dies for the purpose of putting an integral collar on a rod? A. Well, if he couldn't, he could certainly get it from a press company, company that makes punch presses.

"Q. For that purpose? A. Sure."

He further testified concerning the washers:

"Q. When the tie is in place, where are the washers' position? A. At the face of the wall in back of the form. I mean, these spreader washers.

"Q. What's to prevent the washers from sliding inwards and permitting the forms to collapse? A. The collar.

"Q. The integral collars on the rod? A. Yes, sir.

"Q. And that is the purpose of the collar, to prevent inward movement of the washers? A. That's one of the claims, yes, sir."

Snyder also described the process employed by which the integral collars were produced. Briefly, it consists of taking a piece of wire longer than otherwise necessary and compressing it so that there will be a rise or an enlargement at the desired point, which represents the member against which the washer is designed to rest. As already disclosed by his testimony, any machinist could design the dies required for such process. The result obtained is not novel and if novelty be thought to reside in the means, there is no disclosure of the means to be employed. In fact, we see no reason why the collars could not be attached in some other manner without weakening the rod at that point, such as by welding. True, in No. 1,857,610, the welding process was designed to weaken the rod but that was because plaintiff employed a special and secret process, purposely designed to do so. We think it must be assumed from the contention there made that there would be no weakening of the rod by welding if the normal or conventional method was employed.

The break-off element adds nothing to the novelty of the claims, and this is so either with or without prior art. It consists of nothing more than a cut or indentation in the wire at the point desired, which inevitably weakens it at that point. That a piece of steel such as a wire or nail can be weakened so as to be readily broken off at any desired point by chipping or notching it at such point with a chisel or file or some similar device does not require even mechanical learning.

In our judgment, this patent does not disclose invention, and we hold its claim invalid.

## Patent No. 2,107,130

This patent contains one claim, and the novelty asserted has to do with a "water seal," designed to prevent leakage in concrete construction such as water tanks, sewage and oil plants. The claim provides for the conventional rod or tie with a disk or washer member thereon embedded in and surrounded by the concrete structure so as to interrupt the formation of voids around the rod. The essential element of the claim describes the means for holding the disk or washer in position on the rod as "comprising an annular raised rib integrally formed on the rod on each side of the disk whereby the disk is tightly gripped between said annular ribs and any space between the disk and rod is sealed and leakage between the disk and body of the rod is thereby pre-

vented by said ribs." This patent also was subject to much stress in the Patent Office, and in view of the file wrapper history must be strictly limited to this essential element. The application originally contained six claims which merely called for a rod provided with at least one disk-like element positioned so as to interrupt the formation of voids in the concrete. All such claims were rejected upon the prior art cited, whereupon claims 1, 5 and 6 were limited by amendment and claims 2, 3 and 4 were cancelled. The former three claims were rejected the second time. Thereupon, all claims were cancelled, and the single claim allowed which specifies "an annular raised rib integrally formed on the rod on each side of the disk whereby the disk is tightly gripped between said annular ribs."

In arguing for the allowance of this claim, the patentee stated, "Applicant's claim 7 is drawn to cover the integral annular ribs 6 and 7 which tightly hold the washer in position between them on the rod and also act to effectively seal any space which might possibly exist between the washer and the body of the rod." This element is further emphasized by the patentee in his specification, wherein he states that the disk-like members or washers are held rigidly in position on the rods "by the formation of integral shoulders 6 and 7 on the rods between which the washers 5 are securely clamped. These shoulders 6 and 7 are formed by distortion of the body of the rod while the washer is on the rod and they securely clamp the washer in position thereon." Plaintiff's witness Snyder, concerning prior seals for the same purpose, stated:

"Metal pieces might be welded onto the rod, all kinds of different things were used in order to get a stop in the center of the rod or some part within the concrete structure to prevent seepage along the rod * * *."

The welding of a washer to the tie rod and the formation of collars on such rod were not only well-recognized expedients in other prior art patents but they were employed by the patentee in previous patents issued to him, as has been shown in the patents heretofore discussed. Therefore, the novelty in the instant claim, if such there be, is limited entirely to the holding of the disk or washer in position by placing it between two collars or, in the language of the claim, between two "annular ribs."

Defendants assert that Kahn patent No. 768,284 is a complete anticipation. The sole argument made by the plaintiff to meet this contention is that Kahn is not a part of the prior art. True, it does not relate to a tie rod but to a concrete beam used for strengthening the concrete formation. Kahn exhibits a rod with centrifugal raised portions between which washers are confined. The specification states that one of the objectives of the invention is "to provide for a longitudinal tension member for said beam supplemented with said washers or deformations to insure better contact with the concrete body * * *." Thus, the idea of positioning a washer between two collars in order to insure better contact or between "raised portions" or "deformations," as Kahn describes them, is plainly disclosed. In our view, this Kahn disclosure is of the prior art and when so considered it discloses the element relied on for novelty in the instant patent. Plaintiff attempts to avoid the extreme limitation found in this claim by relying upon a statement of the specification that "The disk-like members or washers 5 may be altered in shape or diameter to suit various requirements and may be secured on the rod in any suitable manner." The fallacy of this argument is evident when it is considered that claims which were sufficiently broad to cover such a construction were rejected and that the claim as allowed was specifically limited in the manner above indicated.

While we are of the view that this claim is invalid and so hold, we are of the further view that it comes closer to approaching a patentable status than any of the patents in suit. We therefore think it advisable to consider the question of infringement. As to the claim, plaintiff's witness Snyder testified:

"Q. That refers specifically to a washer and two annular raised integrally formed ribs on the opposite sides of the washer in clamped relation to the washer? A. With a collar on each side of the washer.

"Q. There must be two collars? A. According to the claim."

As to the alleged infringing device, he testified:

"Q. Referring to Defendants' Exhibit 4 and Plaintiff's Exhibit 69 which is the tie screw of defendants with water seal, do you find in that water seal a single washer with two integral annular ribs on the opposite side? A. No, sir, and I mentioned that before.

"Q. Then that particular water seal does not respond to the wording of page 2 of the patent, of the claim of patent No. 2,107,-130? A. No, and my honest opinion is that it is not a water seal."

And again he stated, referring to defendants' device:

"I do not believe that would stop water or any seepage along the rod due to the fact that if it was so tight as to be solid enough to stop the leakage; then it would destroy its value as a form tie because the heat would destroy the tensile strength. That is my opinion."

■ Defendants' accused device does not have a pair of annular ribs between which the disk or washer is confined. It has a single upset rib and a pair of washers welded together. The effect of Snyder's testimony is that such a device does not infringe; in fact, he was of the view that it would not serve the purpose of a water seal. Plaintiff argues that "Except for holding the washer in place, a single annular rib adjacent to a washer, and serving to close the central hole therein, will do precisely what two ribs will do, namely deflect the water flow laterally from the rod." In other words, the accused device is the equivalent of that described in the claim. We think there is merit to this contention if it were not for the fact that the patentee, in order to obtain the allowance of his claim, specifically limited it, as heretofore indicated, and is now estopped from asserting infringement on a device different from that claimed, even though under different circumstances it might constitute infringement under the doctrine of equivalency. Sky Writing Corp. of America v. Phillips Petroleum Co., 97 F.2d 218, 222; Knapp v. Morse, 150 U.S. 221, 224, 14 S.Ct. 81, 37 L.Ed. 1059; Hubbell v. United States, 179 U.S. 77, 80, 21 S.Ct. 24, 45 L.Ed. 95. We therefore hold that this claim is not infringed by the defendants.

### Patent No. 2,162,592

■ The single claim in this patent has to do with cones designed for the purpose of forming sockets or depressions in the concrete wall around the ends of the tie rod. When the cone is removed and the rod is severed, the sockets are filled with a batch of cement flush with the face of the wall. That cones for such purpose were an old expedient is not open to doubt. The sole novelty asserted for this claim is that it provided for "a conical concrete-contacting face provided with a plurality of spaced projections pressed out of the body of the disk [cone] * * * whereby a plurality of spaced recesses or pockets free from communication with either the inner or outer ends of the depression formed in the wall will be produced in said depression for the reception of pointing concrete." To state the matter simply, the concrete forms around the cone, and upon removal of the latter a hole or socket remains which is later filled with concrete. A smooth cone, as previously used by the plaintiff and as shown by other prior art, when removed naturally left the socket with a smooth wall, and difficulty was experienced in obtaining retention of the concrete which was subsequently inserted in order to fill this socket. Therefore, the improvement asserted and the claim call for a cone with "a plurality of spaced projections" which, when removed, leaves corresponding holes or receptacles, thereby increasing the area of the socket and rendering it more receptive to the retention of concrete which is subsequently employed as a filler. The merit of the improvement, as well as the fact that cones or cone washers as they are sometimes called had long been in use, is shown by the witness Snyder. He testified:

"Q. When did your company first adopt the plain cone washers? A. We adopted the plain cone washer, I believe, in 1932 * * *.

"Q. What is the difference between the plain cone washer like that on plaintiff's Exhibit 71 and the cone washer of the patent like that forming plaintiff's Exhibit 61? What is the difference between the two

washers? A. * * * The only difference, Your Honor, is that there are bumps on this, and this has a plain back. That is all. * * *

"Q. In other words, the washer in Exhibit 61 is exactly the same as the cone washer forming a part of plaintiff's Exhibit 71, except that it has outstruck portions or bumps in the body? A. Yes, sir.

"Q. Now those bumps serve merely to increase the area of the socket that is formed in a concrete when the washer is removed, is that correct? A. Yes."

The advantage of a roughened cone surface for the purpose of producing a corresponding roughened surface of the wall of the socket so as to make the latter more receptive for the filler is shown in one form or another by numerous prior art patents, including McCarty No. 915,955, Whitescarver No. 1,665,649, and Anderson No. 1,950,018. McCarty exhibits a cone with a helical rib on its outer periphery, and in its specification states:

" * * * to form serrations in the concrete sockets made thereby, so that when the conical bushings are removed and the sockets filled with concrete, such concrete will be held in place by the threaded or serrated walls of the socket."

Plaintiff distinguishes this patent on the basis that the outer side of the cone is not described in the claims. We know of no rule which limits a previous disclosure to that contained in the claims. The fact is that the idea relied upon in the instant patent was disclosed by McCarty. Whitescarver shows a cone with ridges or humps on its outer periphery, and in his specification states:

"By making the member corrugated, the walls of the recesses formed thereby are correspondingly corrugated to more readily anchor the cement filler in place."

Here again is a disclosure of the idea relied upon for invention in the instant patent. Plaintiff distinguishes this disclosure by again asserting that it was not included as an element of the claims of that patent. Anderson shows a spacer for molding a socket in the concrete wall, the periphery of which is formed by closely wound wire helix which "is adapted to mold ridges 12 in sockets 10. These ridges form mechanical bonds which positively secure the concrete plugs against removal." It is true, as plaintiff points out, that Anderson showed a device for molding the socket other than a cone, but the fact remains that he did disclose a device with an outer roughened surface designed to make the socket more receptive and to better secure the filler against removal.

The patentee's cone, as shown by the exhibit before us and by Snyder's testimony, has six projections, referred to as "bumps." We suppose there is no magic in the number of "bumps" thus utilized, and we do not think it would require an inventor to discover such means for the purpose claimed. It was an improvement which resided well within the area of mechanical skill; in fact, without the aid of any prior art we would hesitate to dignify the disclosure with a patentable status. See Gillette Safety Razor Co. v. Standard Safety Razor Corp., 2 Cir., 74 F.2d 691, 692. We hold the claim of this patent invalid.

### Patent No. 2,222,339

While plaintiff was offering testimony in support of the complaint, its witness Snyder admitted that this patent was not infringed and the charge of infringement was thereupon abandoned. Notwithstanding this concession by plaintiff, the court held the patent valid. Defendants contend that plaintiff's concession of noninfringement rendered the question of validity moot and that the complaint as to this patent should have been dismissed. The authorities relied upon support this contention. Electrical Fittings Corp. et al. v. Thomas & Betts Co. et al., 307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263; Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450; Western States Mach. Co. v. S. S. Hepworth Co., 2 Cir., 152 F.2d 79, 81; Danforth v. Northill Co., 9 Cir., 142 F.2d 51, 52.

Plaintiff stresses certain general rules applicable to a case of this kind, such as the presumption of validity which attaches to the issuance of a patent, the findings and conclusions of the court below, and the commercial success which it is claimed was enjoyed as a result of the patents in suit, or

at any rate as a result of some of them. We are not unmindful of such rules and have given them due consideration. A careful study of the patents involved leads us, as indicated, to a different conclusion. Plaintiff makes much of the defendants' effort to invalidate the patents by "piecemeal anticipation." We do not know if there is such a term as "piecemeal invention," but if there is, it could be applied to the patentee of the patents in suit. To us, it is inconceivable that the improvements perfected step by step, each of which furnished the occasion for a patent, were not within the domain of the ordinary skill of a person trained in the work to which these patents relate.

The judgment is reversed and remanded, with directions that it be vacated and set aside and that the complaint be dismissed, with costs taxed to the plaintiff.